KK-PB vs. 160 Royal Palm. Thank you, Your Honor. May it please the Court, Jason Zakia of White & Case on behalf of Appellant KK-PB Financial with me at council table are my colleagues John Cunningham and Van He. I'd like to address three issues. First, the appeal is not moot. Second, the appellant has appellate standing. And three, the bankruptcy court did abuse its discretion in approving the sale order. Unless the court prefers otherwise, I will address the issues in that order. So first, the appellees have filed a motion to dismiss the appeal, claiming that the appeal is moot. This is based on their allegation that the sale has closed. And while it is true that in the event a sale is completed and the to a purchaser in good faith that can provide. It hadn't really been consummated because all the money is sitting in escrow. Who's holding all the money? So exactly correct, Your Honor. Your Honor. Who's holding the money? The money is in an escrow account and it has not been distributed. Who's holding the money? The escrow agent. Okay. Is that an independent party here? I believe that's correct. Okay. And so Your Honor gets exactly to the heart of our argument as to why no closing and no mootness exist. And that is that the APA approved by the bankruptcy court. And in fact, there's some agreement that says depending on what the court rules and how it goes, then the agents to disperse it accordingly to whatever it is. Yeah, exactly. And Your Honor, since mootness goes to whether this court can craft a remedy in the allegation from appellees is that it's impossible to craft a remedy. Maybe somebody else has questions on mootness, but I think I'd go to standing. I think standing is a little more difficult. Okay, Your Honor. So I will move on. Move it along. Yes. Yes, Your Honor. Two bases on standing that I'd like to address. First, my client had a $39 million secured mortgage claim. And it is true that the bankruptcy court disallowed that claim in the proceedings below. However, that is a separate order, which is currently on appeal in a separate proceeding and has not yet been resolved. That will be resolved in due course. And as we set forth in our brief, as recognized by the Eighth Circuit Bankruptcy Appellate Panel in the Sears case, while that appeal is pending, our client has appellate standing to protect those rights, which while disallowed by the bankruptcy court, could be reinstated if the appeal is successful in this court. And therefore, we would have appellate standing to pursue this appeal in order to protect that pecuniary interest. Except that in the Eighth Circuit case, it seems like it was just dicta, and it doesn't look like there's any kind of analysis whatsoever supporting it. So, Your Honor, I do acknowledge it was a brief discussion in that case. It was only dealt with in a paragraph. I do think that the facts are analogous to here, because there you had two appeals going on. You had the appeal of the underlying disallowance, and then you had separate appeals. Even assuming it's analogous, but maybe you could explain why we should be persuaded by that. What analysis you would use to support that conclusion? So, a couple of reasons, I think, Your Honor. The conclusion, while discussed briefly, does eminently make sense. And so, I think the conclusion that that court reached is very sensible because what it does is it allows a party on appeal to protect rights which haven't been finally extinguished. So, even though the bankruptcy court found, for example, in this case, that our claim for the $39 million was disallowed, that's not final. This court may choose to reverse. Maybe it will, maybe it won't. That's a separate proceeding. And we should not be precluded from protecting that interest here while it is still possible. So, if the test is, are we a potentially aggrieved party, which is the standard on standing, are we a potentially party aggrieved? So, do we have an actual pecuniary interest to protect? I think that the Eighth Circuit BAP's conclusion is absolutely consistent with the fact that we do, which is sensible because if, for example, we were found not to have standing on this to challenge the fact that we contend that what the bankruptcy court did failed to maximize the value for the estate and then get that claim back, it would be too late for us to vindicate that pecuniary interest, which exists because under the sale approved by this court, that claim, if it were reinstated, would not be paid in full. And under either if our bid were to have gone through or an auction that our client argued for were to have occurred and led to a better bid, that would have worked to the pecuniary interest of our client. So, while I do acknowledge that the discussion in that Eighth Circuit BAP case was brief, I think that you should be persuaded because the conclusion was eminently sensible. And I would also note that no contrary authority on this admittedly apparently rare question has been identified by the opposing counsel and we didn't find any ourselves. So, it's the only case that speaks directly to this issue. I think it's a sensible result and I would urge the court to adopt it. Second point, Your Honor, an independent basis of standing is the fact that while it is true that merely a disgruntled or disappointed bidder does not have standing to appeal, there is a well-recognized exception to that when you challenge the fundamental fairness. Here, if you really look at our allegations as to how the sale process, why we're challenging the sale process here, it's that the sale process was structured in a way specifically to exclude our client from that process. And we'll talk about in Issue 3 whether that was permissible or not permissible, but I would suggest that the nature of that dispute is sufficient to fall within the standing exception. The third issue, and I just want to be very transparent with the court, in our brief, we raised a third basis for standing, which is the mechanics lien claim that we purchased. At the time that the briefs were filed, we did not know what the nature of the objection that would be brought by the debtors to that claim. And because at that point it was possible that they would bring a claim to, you know, convert our claim from a secured to unsecured claim, that could have given us a basis of standing. My understanding is they have since filed those objections, and the objections they brought would leave us to an all or nothing result. And so that's why I'm not relying on that third basis here. And I just wanted to explain to the court why our position today was different than what it was in the briefs, and it's because of the changed circumstances that occurred since the brief was filed. So go to the merits, then. Your Honor, to the merits. And I will acknowledge up front, abuse of discretion standard is a high burden to me and a high hill to climb. I think the way to look at this, which was explained by the Second Circuit way back in the Lionel case, is does the debtor have a legitimate business reason for doing what it did, and was there a basis for the bankruptcy court to conclude that the debtor did what it did for legitimate business reasons? I thought early on y'all made an offer, and there was an agreement, and you were supposed to come up with some cash, but then you didn't come up with the cash before we get to this sale. Is that correct? I know there were attenuating circumstances, but in a nutshell, y'all were going to try to buy it, you came up with some agreement, you're supposed to bring, I don't remember how much cash, 500, whatever, but you didn't come up with the cash. For whatever reason you had, you may have had a good reason, you may, whatever, it didn't get consummated, right? I think, Your Honor, it is correct. There were attenuating circumstances. That was a different deal. Whatever the reason was, it was a prior agreement that never got consummated. That also agreement was disapproved by the bankruptcy court. Okay. Because they said you don't really have a claim, you can't treat it as a whatever, a credit claim or whatever y'all call that. That was a different issue, which goes to the— Okay, that goes to the other— Yes, Your Honor. But I'd like to get to the heart of— Given all the delay here, given the nature of inability to perform or extenuating circumstances you claim you didn't have to perform, given all of the background of this, I'm having trouble why the bankruptcy court had abused its discretion in not going with this sure thing. And we know it's a sure thing because the money's sitting right there. We're just waiting for it to be consummated once this is all taken care of. Yes, Your Honor. I think Your Honor gets directly to the— So, I mean, it's a hard standard. There seems to be—I mean, I know there's $3 million difference in the office, $37,940. But this was a sure deal. It's like selling a house. They say, you know, if you got a cash closing, you better just close right now. Your Honor— That's what it seemed to me. Your Honor, it gets to the heart of the matter. I'd like to explain why we think— Why it's an abuse of discretion. Yes. And that is this. We have to ask the question, was there a legitimate business reason? Your Honor, I think, states many of the business reasons that were put forth by the debtor. I think we can break them down into three buckets. I'd like to address each. The first is the one Your Honor talks about. Surety of payment. I do recognize that it could be a legitimate concern to say, I would rather have $39 million for sure than maybe $40 million. The bankruptcy court, to its credit, did an excellent job at the hearing of sniffing out that issue. So as a result, if you look at the bid, which was put forth by my client at that hearing, it was a precondition, which we agreed to at the bankruptcy court's assistance, that 100 percent of the purchase price would be paid up front into escrow as a 100 percent nonrefundable deposit. But it hadn't been paid up at that point, right? I mean, it hadn't been paid, and your client had a history of having not paid previously. Your Honor, it had not been paid because the bid procedures that the bankruptcy court put in place had originally been vacated. So at the time of that hearing, there was no mechanism or process by which we could have paid the deposit. I'm about to go red. May I have one extra minute to address Her Honor's question? Go ahead. Thank you. And there was still time. So the hearing on this, at which the bid was presented, happened on, I believe it was March 8th. The alternate bid required best efforts to be used for a sales order to be entered by March 12th. Absolutely, my client indicated at that hearing, they would pay the money into escrow immediately. That would have cost the debtor nothing. It would not have imperiled the debtor's alternate deal to say, the money comes into escrow today or on Monday, and you still could have met that March 12th deadline. So it would not, in order to give my client- It wasn't going to be the full payment, was it? Yes, it was, Your Honor. 100%, under the terms of this deal, as required by the bankruptcy judge when he had the colloquy with my client's counsel at the sale hearing, 100% of the purchase price, including an additional $5 million to protect against the claim, the additional possibility of additional claims by the city of Palm Beach, would have been paid into escrow, and there would have been 100%- If y'all weren't willing to take over and agree to the Palm Beach 250, though, I mean, that's clear. I know you were going to put some money so you could litigate the Palm Beach claim, but you were not, your client wasn't willing, in its bid, to come off and agree to the 250 and have that be paid. Is that correct? I know y'all said, well, look, we'll put $5 million and we'll deal with it later. That's more than enough. I think it's actually the other way around, Your Honor. The town of Palm Beach was not willing to agree that my client would qualify to take advantage of that settlement. My client would have been happy to have- To have paid the 250 instead of the $5 million. Got it. That's why, as part of that, we agreed up front, on day one, we would put- Pay the $4 million. We would pay that money into escrow. So the issue of, and I'm either happy to address the other issues now or wait for my rebuttal, but on this issue of, was there surety of payment? That was 100% guaranteed, and if we hadn't paid the money into escrow, they would have lost nothing. They still could have gone on the path that they did. There was time to do that. Thank you, Your Honor. Mr. Brunstad. Good morning, Your Honors. Eric Brunstad on behalf of Appellee 160 Royal Palm. With me here at counsel table is Mr. Landau and Mr. Pendergraft. Judge Hall, I'd like to address your concern on standing. I understand counsel to have conceded that the mechanics lien claim they hold is not a basis for standing. Okay, they've reduced it to one. They say that they were excluded from the sale process. And yet, as Your Honor, I think, teased out and as a counsel conceded, oh no, they were included in the sale process. The debtor actually negotiated a sale with them, and they didn't show up with the cash. It was about $5 million they defaulted. In all fairness, they have two bases for standing, but anyway. Yes, Your Honor. I'd like to address, though, what I think is the correct legal standard that this court adopt in the Hare-Ford case, and that is the standard that in order to be a person agree for bankruptcy appellate purposes, the order that the bankruptcy court entered must directly, adversely, and pecuniarily affect their interest. And it plainly doesn't. The outcome of this field, they can't claim as a disappointed bidder that they have a right to appellate standing. That's not legitimate. They claim that they don't like the sale procedures because if there were a different sale procedure, that might have benefited them in some way. They said they were fundamentally unfair, given all the facts and circumstances. But of course, it wasn't fundamentally unfair, given all the facts and circumstances. And if I could run through exactly what happened in this case, the debtor began selling the property right after it filed for bankruptcy in August. It hired Cushman and Wakefield. It basically put out information that was available to approximately 29,000 potential bidders. There were 4,800 views. 335 parties executed confidentiality agreements. There were 40 tours. That reduced to two qualified bidders who were able to be approved by the town to develop this hotel, which had sat for years as an eyesore under the ownership of Mr. Straub. That's one of the reasons why the KKPB is not approved by the town because it's also owned by Mr. Straub. And Mr. Straub had let the hotel languish for years without any improvements being made, for which there was over $4 million in fines that were imposed on the property. So there were two bidders. They had a stocking horse bid with RREF for $32 million. That was negotiated. And then there was only one other bidder who was potentially going to bid, and that was LR. And eventually, they came in for $39.6 million. That was the bid that they proposed. As the bankruptcy court determined, this was a certain bid. This was a good bidder who was qualified by the town.  Mr. Straub had a history of not going through with things. And one thing I think that's important to underscore factually on this record, Your Honors, and that is KKPB did not actually propose to bid on this property. They're standing here before the court saying, we would have proposed a bid. That's not what happened below. Our proposal is that somebody else will bid on this property, that we'll have an auction. And that other entity was this entity called Kids 2 LLC. Well, where are they? They're not here before the court challenging that this was somehow unfair to them. They did not propose, again, they did not propose to bid on this property at all. They said, we want somebody else to bid on it. It was a last minute after the fact, after the deadline. There was a time when they wanted to bid, and they wanted to have credit for the debt. Correct, Your Honor. And that was disallowed by the bankruptcy court because, but the reason why is because they participated in a fraudulent scheme. Now, this underscores the whole thing. Mr. Straub owned the debtor. The debtor was being run by Mr. Matthews. Mr. Matthews was perpetrating a massive EB-5 visa fraud against foreign investors. He was saying, invest in this property. I'll give you an EB-5 visa. Only he just took the money and spent it. He defrauded all these creditors. They have tens of millions of dollars of claims against the debtor. Mr. Straub was the former equity owner of the debtor. He decided, well, I need to sell my equity interest. So I'm going to sell it to an outfit owned by Mr. Matthews and his wife. Only Mr. Matthews and his wife and this entity, Palm House, is not going to pay for it. The debtor is going to pay for it by giving Mr. Straub $6 million, and the debtor is going to pay for it by giving Mr. Straub a mortgage lien on the property, which had the effect of elevating his worthless equity interest into a secured claim to beat out the fraud victims. The bankruptcy court took a look at this and said, this is a fraudulent transfer scheme. That's why their claim was estimated at zero, and it properly was estimated at zero. So they have no claim. Properly so. That's what the other appeal. Correct. But that underscores what's happening in this case. They are trying to use this process to perpetuate a fraudulent transfer scheme. So Mr. Straub can suck the value of the hotel and not allow for the EB-5 victims to be paid. They have been waiting for years to be paid. LR has put the cash in escrow. Judge Hall, I'd like to address a point you also made on standing. It's not true that all of the cash has been parked with Chicago Title, the escrow agent. Over a million dollars of the proceeds have actually been spent to pay Cushman and Wakefield, the party who marketed the property, to pay taxes to the town, to pay RREF's breakup fee, to pay the title insurance policy. Only some of the proceeds are left there in the escrow account. $39 million or whatever it is? It's over $30 million, the bulk of it. A million is done no matter who buys the property. You've got to pay the taxes. You've got to pay Cushman. I mean, no matter who buys this thing, that had to be dispersed. Correct, Your Honor. But the test for mootness under Section 363M is, did the bankruptcy court approve the sale? Undisputed. Did the appellant fail to obtain a stay? Undisputed. Did not obtain a stay. Did the purchaser act in good faith? Well, here the bankruptcy court made specific findings. They never challenged that on appeal. So I say that's established, too. I mean, it does seem like the escrow is effectively acting like a stay as far as mootness goes. I mean, it seems like it's got the same practical effect. No, Your Honor, and here's why. Under the statute, 363M says you can't undo a sale. So what we have to talk about, this is, I think they're leading the court down a garden path. What constitutes a sale? Funds are escrowed after sale all the time. It doesn't mean that the sale hasn't occurred. It's not really a sale, though. It's not a complete sale, and let me tell you why. Because if we don't get this whole thing resolved by May 15th of 2020, then the sale goes away. Does it not? It can, unless the buyer subsidizes. So that's the problem, right? So it's conditional, and all of the money for the sale is in escrow right now. Except for the money that you've just spoken of. But even so, it seems like that effectively serves the same purpose that a stay would serve. And it doesn't seem like it's a final sale if it automatically dissolves if we don't resolve this whole thing by May 15th of next year. Well, it doesn't automatically resolve, Your Honor. It could be undone. That's true. That's true. But any sale can be undone after it's actually been done. The question is the matter of Florida law. But most sales don't have a one-year provision written in that authorizes it to occur. I mean, yes, a buyer could try to undo a sale afterwards, but there's no guarantee that a buyer could. Here, there is a guarantee that the buyer could. Well, they would have the option to if the conditions are met. That's true. But there's a guarantee that if they opted to, they could. But the point I want to make is that whether a sale has occurred or not is a question of Florida law. And under Florida law, the concern Your Honor raised, I understand, is irrelevant to the legal analysis. That's the point. There's a Florida statute on point. We cite it in our brief, Section 689.27. When you have recordation of title, which happened here, and transfer of possession, which happened here, you have a sale. That meets the statutory criteria of Section 363M, so we have one. I submit as a matter of law, the consideration that Your Honor is making actually doesn't play under the statute. But I understand. And I wanted to get to the merits. Why? Can I just ask you a quick question before you do that? Are you seeking to expedite the other appeal so that maybe this whole thing can be resolved and the sale can be saved? It has been expedited, Your Honor. The briefing schedule has been put in place. It will be dealt with in short order. But again, here is the key consideration why we are respectfully requesting— I'm sorry. When I say expedited, I mean it's sort of a term of art here. People move to expedite the case. We will decide whether or not we're going to grant expedited consideration. You're saying that's been done in this case? Their brief is due next month. Our brief is due in January. I believe that's— That doesn't expedite the case. I see, Your Honor. Notice of appeal was just filed. Correct. The district court just certified the question. They just filed a petition for permission to appeal. I think the court— On November 17th, 18th. I mean, it's just—and so that's a regular briefing schedule you're talking about. Okay, well— Has anybody filed a motion to expedite that? Not that I know of, Your Honor. Okay, so that's not expedited. Okay. The reason why we think expedition—and we respectfully and emphatically urge affirmance of the district court's order approving the sale as quickly as possible is because these EB-5 investors, the only thing that stands between them and getting their life savings back in many instances is affirmance of the sale— You're making policy arguments and these are bad people, these are good people. We need to go to whether there was—on the merits. Yes, Your Honor. Just the merits, I promise you. We understand they're— That's what I want— Do you know what I mean? We need the merits. I do, Judge Hall. And on the merits, there was no—the bankruptcy court determined there was proper notice here under Rule 2002 and that was not clearly erroneous. They've known since August that this was proposed—that the sale was in the works. They had ample notice of the procedures. And I would note that they object to the sale procedures order now on appeal, but they never objected to it in front of the bankruptcy court. So my argument is that that argument was waived. Their appeal on the notice is essentially frivolous. They didn't object below. They can't come up here now and say the sale procedures order is somehow invalid. The problem is there was not a legitimate business reason and judgment for the sale. That's what you look at. Does the data have a legitimate business reason and judgment for the sale as opposed to hearing from everybody who's trying to bid? And here, it plainly was, we defer to the debtor's business judgment. It was reasonable and it was not an abuse of discretion for the bankruptcy court to decide. All right, so you need to tell us why. For all the reasons that Your Honor recited, and I'd like to add the additional delay that would have been involved in having this potential other party who— Well, what besides surety of payment? He says, well, that's not really good enough because we had done—I'll have to look at the record to see what the payment they were offering, but surety of payment. What else? Were there legitimate business reasons you're saying it should be approved? Well, the fact that the prior history was that they don't come through with their deals. They don't honor their deals. They didn't do what they were supposed to do. The real reason why the settlement failed with them previously was they didn't come up with the $5 million they were supposed to pay. The bankruptcy judge is—his verbal order doesn't touch on that point. It doesn't, but his subsequent order and his opinion that's appended to his sale order and to his order denying the stay elaborates that that would have been an additional consideration to deny the settlement was that they didn't come up with the cash if he had known about it. So he did explain it later, Your Honor. In addition, there was no written proposal. Mr. Straub has a history of litigating everything. They didn't actually come up with the proposal themselves. It was this affiliate who was going to perhaps bid, but that affiliate we'd never seen of or heard from before. They were past the March 5th deadline—the March 4th deadline for filing, you know, proposing a bid. They just show up in court in sort of a shifting proposal. It would have jeopardized the town's settlement because they're not—it's not certain that it actually was even the highest bid, let alone the highest and best bid, and that's the standard. It has to be both the highest and best bid given all the contingencies, the prior dealing, the additional delay, and also, Your Honor, they didn't just want to be able to put in this additional bid for which we don't know whether they had the cash available or not or what this other entity was actually going to do. They also wanted an additional auction further down the road, and what this was really kind of transparently demonstrating is that they just really wanted additional delay to keep delaying the sale over and over and over and over and over again because, again, what they've really wanted to do, which is evidenced by their participating in the fraudulent transfer scheme from the beginning, is to ultimately get this asset, the value of the asset, out of the estate without having to pay anything for it at all at the expense and to the prejudice of the actual creditors of this case, these EB-5 victims. So going to the point of delay, I know I've already mentioned this, but nobody likes to do work for no reason, right? Yes, Your Honor. We're going to work hard to try to get this done as quickly as we can. Thank you, Your Honor. But if there's no expediting of the other appeal, right, then the court will not be alerted to the time concerns. I'm not saying the court would necessarily grant a motion to expedite. Yes, Your Honor. But, I mean, I don't know what your position is on that. I'm not telling you what to do, but it would be nice for us to know if you intend to do that. I hear Your Honor's suggestion, and since I wasn't thinking of it before, I will consult with my co-counsel and take it very seriously, I assure you. We might not grant it. I'm not suggesting that we would, but the panel that sees it, which may or may not turn out to be us, should at least be alerted to the fact that there is a time consideration, and if it chooses to heed that time consideration, it has that information up front. But I'd like to go back to why the two appeals really aren't related for our purposes here, fully apart from whether their claim was estimated at zero or not. What they are complaining about here is that— Right. It doesn't matter to me whether they're related or not. I see, Your Honor. Right? If the other one doesn't get resolved and the sale doesn't go through by May 15, 2020, then you all have the option, or L.R. has the option of backing out, right? Is that right? Am I understanding this correctly? Correct, Your Honor. Okay. It's one caveat, with a caveat. Okay. If the court affirms the sale order, if, for example, it were to do that today, then the funds would go, the sale would close, it would be transferred, the debtors plan would be confirmed. Shortly, EB-5 investors would be paid on their fraud claims. Regardless of what happens on the other appeal. Correct. Because they're a priority over the other claim. We believe so, yes, Your Honor. We believe the funds would go out, okay, and then they would be paid. So that's why I say that the resolution of this appeal is all that we need to get the bankruptcy case done and the funds distributed to the proper fraud victims who deserve it and are entitled to receive it. So, you know, the estimation appeal can continue. They can make whatever arguments they want. But that other appeal has to be decided, it seems to me, before you can disperse the money to the investors, I guess. There are ways, Your Honor, of dealing with that in the plan context. There are ways of dealing with those kinds of contingencies and escrowing of funds and those things if that has to happen. That obviously is not before the court. But again, if the court affirms today the sale order, the sale proceeds will be distributed, the debtor's plan will be confirmed, and that will happen irrespective of what is happening with their appeal on the estimation order. But I submit, again, on the question of standing, they are not adversely and pecuniarily affected by what they claim to be unfair sale procedures. But on the merits, the procedures were not unfair in any way, shape, or form. Rule 6007 authorizes private sales. There were only two bidders here who actually showed up who were willing to bid and park their cash and actually buy this property. They were the bird in the hands. As the district court ruled in her opinion, the debtor took the bird in the hand approach. This was perfectly reasonable for the debtor to do. And as a result, the debtor went with the bird in the hand. Dealing with Mr. Straub had been fraught with difficulty before. They never actually showed up and presented an actual bid. The additional delay was incredibly prejudicial. And for all the reasons that I've talked about, and for the reasons we've set forth in our brief, I notice my time is over. We do respectfully urge that the court affirm the district court's affirmance of the sale procedure. Thank you very much, Your Honors. Your Honors, I'm going to focus on the merits in the five minutes I have remaining. I do have to say, please don't take my failure to respond to a number of the accusations about the we are bad people stuff as an admission that any of that was correct. I just think it's irrelevant to this appeal. So unless the court wants, I'm going to skip it and move to the merits of why we believe it was an abuse of discretion. So first, I want to address this whole it wasn't my client that was going to make the bid. That's not correct. My client was going to make the bid under the terms of the APA. And remember that the bid that we were making was we were going to take the APA that they had agreed to with L.R. as is. We were going to change the name of the buyer to us, and we were going to have this contingency for an auction. Other than that, and the fact that the price was higher, the terms of the sale that we were proposing were identical, okay? Under the terms of that APA. What do you mean we're going to have in our bid the contingency of an auction? Yes, Your Honor, I'd like to. That sounds like a big contingency. That is a it's not actually a contingency. It was a condition, and let me explain why. Well, I don't care whether it's contingency or condition. That is delay. You've got to have an auction and see if somebody else comes in and buy it. Is that what that means? So what it means, Your Honor, is that Help me explain what the condition is. That means your client had a right to conduct an auction. Yes, and if no one topped our bid, we were required to buy it for the purchase price that would have been wired into escrow the day or the day after the hearing where we made the offer. When would that purchase have occurred? So the condition was that the auction would occur within 30 days or less, and I acknowledge that's a 30-day delay, and I'm going to explain why that. When would the payment then have been wired in if nobody else made a bid? The payment would have been sitting with the bankruptcy court or with the debtor from the day. When would the sale have been consummated? So if no bid occurred, it would have been consummated on the 30th day. If there was a topping bid, then the court could approve the alternate topping bid. And there had been 18 months of looking for other bids, and in all of those 18 months and the thousands of people who were solicited and the hundreds of people who submitted bids, there were two, only two, who were found to have actual interest and have the means to be able to consummate a sale. So what made you think that there was any basis for believing anybody else would buy this? Remember, Your Honor, the revised sale procedures which converted this from a public auction, which is what the debtor initially chose and the bankruptcy court originally approved, had a bid deadline to test whether there was anyone else out there. And the court, at the debtor's request, vacated those procedures and canceled that bid deadline two days before the deadline occurred. So we'll never know for sure if someone would have showed up. That was because y'all were going to make a bid and you hadn't made an agreement. I'm sorry, Your Honor? That's because your client came on the scene with a proposal. So we came on a... That's why they canceled the auction, because y'all said y'all were going to do what you were going to do. I don't believe that's correct, Your Honor. Okay. They canceled the auction because they made the judgment that they could sell 2LR for a price that was higher than the original stocking horse, and a condition of that was canceling the auction and making it a private sale. Okay, so it wasn't with y'all coming on the scene. We came in to object, and counsel's incorrect. We did object at the sale procedures hearing. It was only on two days. You've clarified it, so go back to the merits. Okay. But to answer your questions, Your Honor... Sorry. The cash, just so we understand that there was no risk to the debtor of accepting our proposal, our purchase price, which was over $45 million, which is $1 million more than the LR price... None of it means anything if it doesn't go through. Exactly correct, Your Honor, but I want to explain why that concern didn't exist here. So, plus the $5 million to cover any... Roughly, it was 4 point something, I'm sorry, to cover the additional costs associated if the Palm Beach settlement fell through. That money, under the terms of our bid, was going to be parked with the bankruptcy court and the debtor on day one. So then the auction would occur, but we wouldn't have... There would be no risk that we couldn't pay, because the money would be there. And that's how the bank... Nothing committed you to pay in 30 days. If there were no other bid, isn't that right? What committed... Tell me the parts of the agreement that would have committed you for the sale to go through at that time, escrow to change hands, everything to be consummated, there to be no backing out by your client. As a stocking horse bidder, which is what our client was offering to do, with no break-up fee, no bid protections, nothing that normally stocking... No goodies that stocking horse bidders usually ask for. We were going to be a stocking horse bidder... Where in the record does it show that that offer would have gone through on the 30th day if there were no other bids, and that there would have been no way for you to back out of it? Where does it show that? So in the colloquy, and I can give Your Honor the record site, but from the transcript at the sale hearing, where counsel from my client was discussing this bid with the bankruptcy judge, the bankruptcy judge was very clear that there had to be his words, cash on the barrel head, no risk. We agreed to that. We would be a stocking horse bidder, and as a stocking horse bidder, what you're saying as a stocking horse bidder is that if there's no topping bid, we'll take it at that price. The cash would have been sitting there. There was no risk. If I could just... I'm sorry, Your Honor. That's okay. If I could address one point I would like to, which is the... Oh, I'm sorry. I thought you were going to tell me where in the record it was. So I'm sorry, Your Honor. On the record, in the colloquy, there was the discussion of us being a stocking horse bidder, and I will... Stocking horse bidder, I mean, yes. If there's no topping bid, the stocking horse bidder is the buyer. I understand what that means, but there's nothing that bound you to do that in 30 days, no excuses, no getting out of it. Isn't that right? I disagree, Your Honor. I think if you look at the representations made on the record at the sale hearing, it was, and the bankruptcy judge assisted on this, and we agreed to it. Did you come in with a written agreement, or was this all oral? I thought it was all oral. It was oral, Your Honor, which is why there's the ambiguity that Judge Rosenbaum and I are discussing, but I believe that the discussion, as orchestrated by the bankruptcy judge, to make it as concrete as possible, did address this point, even if not explicitly. I think it addressed... What you're saying is in the colloquy of the bankruptcy judge, it became obvious that you were bound, period. We were bound, yes, and that is... Regardless of what happened at the sale. Right, and that's why the money was going to be paid, to protect against any risk that the sale would fall through. And I apologize, I know I'm over... Did you put in a letter of credit or anything like that to show ability to close? So what we put in, Your Honor, was a cashier's check from Bank of America made out to my client's principal, Mr. Schraub, for $50 million. By how much? Which showed that he... Sorry, Your Honor? By how much money? $50 million, which was more than enough to cover the obligations under the sale. But it wasn't made out to the bankruptcy court, it was made out to your client. Right, but that showed that my client had immediately available funds, able to meet the obligation to wire the money immediately. If I could, and I apologize for going over, can I just make one quick point on delay? Because the other justification is they didn't want to have any delay. And I just think if you look at their stated reason, which is that they felt my client was litigious, and that doing a deal with us would lead to protracted delay, and I do acknowledge the auction was a delay of 30 days. If you look at the deal they took, they took a deal which was conditioned, and this gets back to the mootness point, it was conditioned on a final non-appealable order. So the deal they took... Except that there would be a final non-appealable order if you all didn't appeal. It was your right, I'm not suggesting that it wasn't, or that you should be penalized in any way for appealing. But I don't think we can blame the fact that they took a deal that didn't become final until the appeals were finalized. I'm not suggesting we should blame them, Your Honor. I'm asking the court to examine the logic offered by the debtors. Don't have to take my logic. I'm taking their stated objectives, which is the following. This was the testimony that they offered at the bankruptcy hearing, and this is what the bankruptcy judge credited. We don't want to do business with Mr. Straub because he's the most litigious person in the world. That was one of their stated reasons. They then took a deal that was conditioned on all of that litigation being resolved. I'm not saying we punish them, Your Honor. I'm asking if you were judging... How can you benefit... To assume that that would go fast. If the district... I'm sorry, if the bankruptcy court is agreeing that that's a decent reason for choosing the deal, right? And the reason, in part, is that your client is extremely litigious. How can we then find that it was an abuse of discretion for the district court, for the bankruptcy court, to pick that particular offer because you were going to continue to litigate? I mean, that seems problematic. Your Honor, I'm just asking you to take their logic as explained and examine it on its face. If they were concerned that we were litigious, that was their stated reason. For them to take a deal conditioned on us stopping our litigation or expanding it and say that it was faster, I'm not asking to blame them, but for them to make the judgment that that deal, which was conditioned on the exhaustion of all these appeals, was a faster way to go than waiting 30 days to do the auction that my client was proposing... Assuming everything went through and there was no more litigation. Well, Your Honor, no, that's actually not true. The separate appeal and dropping... So that deal that everyone talks about where we didn't pay the $5 million, that was different than this deal. That was a global settlement that would have involved resolving all litigation, including that other case. That fell through. We could buy this asset without resolving the question of our secured claim. The money will go into the bankruptcy estate and then we'll fight. If we win the appeal, we would get back in line and priority to get some of those proceeds. If we lose the appeal, it would go to other people. We wouldn't get it. You don't need to tie those two together. And so our sale and the payment of the money to the bankruptcy estate wouldn't have been in any way tied to the resolution of the other appeal. It would have been once the auction happened, if there was a topping being great. If not, it's over. So my only point, Your Honor, is that judgment that the debtors made, that they're saying is reasonable and that the bankruptcy court approved, 30-day delay, they say is bad. I'm suggesting the deal they picked was worse from a delay perspective. And we know that because we're here in November and it still hasn't closed. And why is that other appeal so far behind this one? I don't quite figure out. There was a resolution order or whatever you call that order. Yeah, they were issued. There were three issues in that order, as I understand it. Yeah. And so why is this appeal, they were all entered around the three orders around the same time. Why is that appeal so behind? I'm going to give you my answer, Your Honor, qualifying. I'm not 100% sure. I believe this appeal was expedited through in the district court. And that one may not have been. So they just now granted you. Yes. And so then the district judge suggested sui sponte that it come directly here, I think, to catch it up. Now just certified it. You're right. That's it. We have a case. Thank you, Your Honor. I thank you very much. I apologize for going over. Court will be in recess until 9 in the morning.